Argued and submitted January 24, affirmed March 22, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

EDWARD JOSEPH HALL, JR.,
*Defendant-Appellant.*

Clackamas County Circuit Court
20CR19840; A175119

526 P3d 815

Defendant appeals from a judgment of conviction for second-degree robbery. On appeal, he challenges the trial court's denials of his motion to suppress evidence the state obtained from a private person and his request to give a witness-false-in-part jury instruction. *Held*: The Court of Appeals concluded that the seizure of evidence did not constitute state action because the private person was not acting as an agent of the state in procuring the evidence. Thus, the court did not err in denying defendant's motion to suppress. In addition, because the evidence at trial did not support an inference that the witness "consciously testified falsely," as required under *State v. Payne*, 366 Or 588, 607, 468 P3d 445 (2020), the trial court did not err in declining to give the witness-false-in-part jury instruction.

Affirmed.

Thomas J. Rastetter, Judge.

Sarah M. De La Cruz, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Hellman, Judge.

JOYCE, J.

Affirmed.

Hellman, J., concurring.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for second-degree robbery.[1] On appeal, he challenges the denials of his motion to suppress and his request to give a witness-false-in-part jury instruction. We affirm.

## MOTION TO SUPPRESS

We are bound by the trial court's findings so long as they are supported by the record; we state the facts consistently with our standard of review. *State v. Davis*, 286 Or App 528, 529, 400 P3d 994 (2017). Because the motion to suppress was focused on whether a third party's seizure of evidence constituted state action for purposes of Article I, section 9, of the Oregon Constitution, we focus our discussion on the facts giving rise to that seizure.

Based on evidence obtained after a robbery at Home Depot, police arrested defendant in the lobby of his apartment building. An investigating detective, Helmer, identified several pieces of potential evidence that they wanted to obtain, including a pair of shoes and a cellphone. After police arrested defendant, Helmer asked for his consent to search his apartment. Defendant "didn't really respond to that," leading Helmer to believe that defendant did not consent to a search. Helmer watched surveillance video from the apartment building that showed defendant wearing the shoes that Helmer was looking for, which defendant was not wearing at the time of his arrest. Helmer thus believed the shoes could be in defendant's apartment. After learning that another person might also be in defendant's apartment, Helmer went there. His purpose was to develop additional probable cause to search the apartment and then obtain a search warrant to do so.

Helmer knocked at the apartment's door, and Smith answered it. Helmer, who was dressed in plain clothes and not displaying a gun, showed Smith his identification badge. A second detective, Case, stood off to the side. Helmer told Smith that defendant had been arrested. Smith said that

---

[1] The court merged two guilty verdicts, one for second-degree theft and one for second-degree robbery, into a single conviction for second-degree robbery.

defendant was a friend and that she did not live in the apartment. Helmer told Smith that he was looking for defendant's shoes and cellphone, among other items. He showed her a picture of the shoes, as well as several other items. Helmer asked if Smith had seen the shoes or a cellphone, and Smith said that they were in the apartment.

Helmer believes that "when you ask [people] about certain items inside somewhere, it's their natural inclination to perhaps go and retrieve those items." Thus, "[t]o prevent her from doing that," Helmer "specifically told [Smith that he] was not asking her to search the apartment and [] was not telling her to get any items for [him]." Smith then suggested that Helmer come inside to retrieve the shoes and phone. Helmer explained that he was "not going to do that and that [he] would apply for a search warrant." Smith told him that "it wouldn't be necessary and she would get them[.]" Helmer responded, "okay." Smith got the shoes and cellphone and handed them to Helmer as he stood outside the apartment.[2]

Helmer later contacted Smith by phone. During that call, Smith recalled her interaction with Helmer and that he had told her that he could get a warrant to obtain the shoes and phone. Smith confirmed that Helmer never came into the apartment and that he had never given her an order to do something.

Defendant filed a motion to suppress his shoes and cellphone. He argued that the seizure occurred without a warrant and was therefore illegal. In defendant's view, even though Smith retrieved the evidence, she did so at the direction of the officers, rendering her conduct state action.

At the suppression hearing, Helmer and Case testified to the facts set forth above. Helmer emphasized that he never asked Smith to retrieve the items, nor did he direct or encourage her to do so. Rather, it was Smith's idea. Case, the second detective who was present, also confirmed that Helmer had not directed, commanded, or encouraged Smith to obtain the items; rather, Smith offered.

---

[2] Helmer later obtained a warrant to search the cellphone.

The trial court denied defendant's motion to suppress. It ruled that Smith was not acting as an agent of the state. In so ruling, it expressly credited Helmer's testimony:

> "I do find [Helmer's] testimony to be credible. Ms. Smith got the items on her own volition. There was no encouragement from the officers, and actually the deputy firmly told her, 'I'm not asking you to get them.' So she was not acting as an agent of the state."

Defendant challenges that ruling on appeal. Because we conclude that the trial court correctly determined that Smith was not acting as an agent of the state, such that the seizure of the cellphone and shoes did not implicate Article I, section 9, we affirm.

Article I, section 9, of the Oregon Constitution, protects individuals against "unreasonable search, or seizure[.]" That provision, however, applies only to government action. *State v. Sines*, 359 Or 41, 50, 379 P3d 502 (2016). That said, Article I, section 9, is implicated if a private person undertakes a search or seizure at the state's behest. *Id.* Where, for instance, the state asks a private person to search "'a particular place or thing, and if the private person acts because of and within the scope of the state's request,'" the private person's actions implicate Article I, section 9. *Id.* at 51 (quoting *State v. Tucker*, 330 Or 85, 90, 997 P2d 182 (2000)).

But a private person's actions can become state action even in the absence of an officer overtly directing, instigating, or participating in a search or seizure. For example, the court in *Sines* addressed the question of when a private person becomes a state actor where an officer's communication or involvement in a search or seizure does not involve that type of overt direction to a third party. In *Sines*, the defendant's housekeeper contacted DHS after developing concerns that the defendant was sexually abusing his daughter. *Id.* at 45. The housekeeper told the DHS employee that she was considering taking a pair of the victim's underwear, which she believed contained evidence of abuse, from the defendant's house. *Id.* The DHS employee told the housekeeper several times that he could not tell her to take that kind of action and that it was her decision whether to do so. *Id.* The DHS employee gave the housekeeper his telephone

number because he anticipated, based on their conversation, that she would take the underwear. *Id.* DHS in turn contacted the police. *Id.* at 46. The housekeeper did in fact take a pair of the victim's underwear, called DHS, and the DHS employee arranged for her to bring the underwear to DHS and the police the next day. *Id.* The underwear led to the defendant's indictment on several sexual offenses. *Id.*

The defendant sought to suppress the evidence, arguing that the housekeeper was acting as an instrument or agent of the government. *Id.* at 47. The Supreme Court disagreed. *Id.* at 60. In doing so, it observed that common-law agency principles provided "substantial assistance" in determining whether a private person's seizure was state action. *Id.* at 55. Common-law agency exists where a principal "'manifests assent'" to the agent that the agent "'shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Id.* (quoting *Restatement (Third) of Agency* § 1.01 (2006)). "The considerations relevant to the existence of an agent's actual authority to act on behalf of the principal focus on the 'principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf.'" *Id.* (quoting *Restatement* § 3.01). "Whether the principal 'manifests' assent for the agent to act, and whether the agent manifests assent or otherwise agrees so to act, are determined by 'written or spoken words or other conduct.'" *Id.* (quoting *Restatement* § 1.03).

The court noted that one of the benefits of considering common-law agency principles is the emphasis on "'manifestations' that can be assessed objectively[.]" *Id.* Conversely, the test that the defendant had proposed—which focused on what the DHS employee "knew" and "believed" about the housekeeper's likely actions—were not useful, because they required the factfinder to consider subjective mental states, rather than statements and conduct that could be objectively assessed. *Id.* at 58. The court also rejected the defendant's argument that mere knowledge or acquiescence by an officer would transform a private person's conduct into state action;

rather, something akin to active participation or encouragement was necessary. *Id.* at 58-59.

As applied to the housekeeper's conduct, the court concluded that the DHS employee had not directed or requested her to take the underwear. *Id.* at 60-61. Although the DHS employee "knew" or "thought" or "understood" that the housekeeper might do so, the common-law agency analysis that the court had outlined "look[] first to objective manifestations by the principal to the agent that the agent should or may act on behalf of the principal." *Id.* at 60. That approach "is consistent with the federal courts' emphasis on affirmative government conduct *vis à vis* the private person." *Id.* (quoting *United States v. Koenig*, 856 F2d 843, 850 (7th Cir 1988) ("'It is only by the exercise of some form of control that the actions of one may be attributed to another.'")). What is more, "'[m]ere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control.'" *Id.* (quoting *United States v. Smythe*, 84 F3d 1240, 1242-43 (10th Cir 1996) ("to make private conduct into state action, government agent must 'affirmatively encourage, initiate, or instigate the private action'")). In *Sines*, the record reflected "little, if any, such affirmative encouragement, initiation, or instigation[.]" *Id.*

In contrast, in *State v. Lien/Wilverding*, 364 Or 750, 441 P3d 185 (2019), the court found the kind of agency relationship that *did* implicate Article I, section 9. There, the police "asked" a garbage company to pick up the defendant's garbage and deliver it to the police. *Id.* at 752-53. The garbage company's manager complied and delivered the defendant's bin to the police. *Id.* at 753. The trial court found that the manager had acted "exclusively at the request and direction of the police," a finding that was binding on the court. *Id.* at 768. On those facts, the court had little problem concluding that under *Sines*, the police, as principals, and the garbage company's manager, as the agent, had entered into an agency relationship, transforming the manager into a state actor. *Id.*

*Sines* and *Lien/Wilverding* serve as useful bookends for this case. We know from *Sines* that where a state official

does not affirmatively encourage or instigate a search or sei-zure, a private person who seizes evidence does not become a state actor, even if the official may know or believe that the private person might undertake that seizure. Conversely, as in *Lien/Wilverding*, where a state official expressly asks a private person to engage in a seizure, and the person does so, that person becomes an agent of the state principal and thus a state actor.

Here, as the trial court's factual findings reflect, Helmer did not expressly communicate to Smith that she was authorized to act as an agent of the state. As in *Sines*, the state official, Helmer, did not "direct or request" that Smith seize the phone or shoes. To the contrary, Helmer expressly told Smith that he was *not* asking her to search the apartment or retrieve the items. As the court found, Smith acted "on her own volition." We are bound by those factual findings. *Lien/Wilverding*, 364 Or at 768 (court was bound by trial court's finding that the private person had acted "exclusively at the request and direction of the police"). As such, no principal/agent relationship formed that transformed Smith's actions into state action for pur-poses of Article I, section 9.

In arguing otherwise, defendant maintains that Helmer's "actions show that he affirmatively encouraged Smith to search for evidence" by showing her a picture of the items and telling her that he would come back with a search warrant to retrieve them. In defendant's view, Helmer's actions "clearly conveyed that he was inviting her" to seize the items. Defendant also finds significance in the fact that Helmer initiated contact with Smith, unlike in *Sines*, where it was the housekeeper who first contacted state officials.

The difficulty with defendant's first point is that it is contrary to the trial court's factual findings that the evidence in the record supports. As noted, the court's find-ings are binding on us, and the court expressly found that there was "no encouragement from the officers" and Smith retrieved the "items on her own volition." And given those findings, the fact that Helmer responded "okay" when Smith volunteered to go get the items does not transform her con-duct into state action. *See Sines*, 359 Or at 59-60; *see also*

*Smythe*, 84 F3d at 1242-43 (police need not discourage private persons from doing something that is lawful); *United States v. Jarrett*, 338 F3d 339, 344 (4th Cir 2003) (government "must do more than passively accept or acquiesce in a private party's search efforts").

Moreover, while it is true that Helmer initiated contact with Smith, that initiation alone does not, on the facts of this case transform what is otherwise nonstate action into state action. Importantly, Helmer did not initiate (or direct or instigate or encourage) the *seizure* itself—as we have already observed, Smith herself did that. While we are not suggesting that the fact that Helmer initiated the contact with Smith is wholly irrelevant, it is not enough on this record—on its own or combined with Helmer's initiation of the contact—to render Smith a state agent.

We therefore conclude that the trial court correctly denied defendant's motion to suppress.

## WITNESS-FALSE-IN-PART INSTRUCTION

Defendant also assigns error to the trial court's refusal to give the witness false-in-part jury instruction. We review the evidence in the light most favorable to defendant, the party who requested the instruction, and review the trial court's decision not to give the instruction for errors of law. *State v. Daly*, 308 Or App 74, 79-80, 479 P3d 335 (2020) (citing *State v. Payne*, 366 Or 588, 607, 468 P3d 445 (2020)). We conclude that the court did not error in denying the instructions.

We begin by discussing the parameters of the instruction. The witness-false-in-part instruction comes from ORS 10.095(3), which provides that the jury is "to be instructed by the court on all proper occasions *** [t]hat a witness false in one part of the testimony of the witness may be distrusted in others." The Supreme Court recently explained that the instruction should be given when the trial court concludes, in the light most favorable to the party seeking the instruction, that "sufficient evidence exists for the jury to decide that at least one witness consciously testified falsely and that the false testimony concerns a material

issue." *Payne*, 366 Or at 607.[3] An "honest mistake, confusion, or hazy recollection" is insufficient to trigger the instruction. *Id.* at 608; *see also State v. Kinstler*, 307 Or App 517, 523-24, 478 P3d 595 (2020) (the instruction is not required when "discrepancies, even when viewed in the light most favorable to defendant, are of the type that suggest lapses in memory, differences in perspective, and, at worst, an example of a witness's selective choice of words to downplay his potential role").

Here, defendant's request for the instruction centered on the Home Depot loss prevention officer's testimony about whether defendant's backpack was zipped.[4] Lashbaugh, the loss prevention officer, testified that he saw defendant place what looked to be an empty backpack in a cart. He then selected two items, a drill and drill battery, and appeared to put them in his backpack. As particularly relevant here, Lashbaugh testified that "the backpack had been zipped up" as defendant began to walk away. Defendant then walked past him to the outdoor garden department and past the registers. He then turned around and walked back into the store and towards the restroom. Lashbaugh and a second loss prevention officer, Dennard, contacted defendant. Defendant became hostile and walked into the parking lot. Lashbaugh testified that at that point, he noticed that the backpack that defendant was wearing "was actually pretty—about halfway zipped, three-quarters zipped kinda thing, the merchandise literally, we could see it through the backpack" and "actually poking out of the backpack." Lashbaugh testified that Dennard "had reached out and actually pulled down on the backpack and in an attempt to get the merchandise back, obviously; it was literally just hanging out." Lashbaugh did not include that detail in his written report. Dennard testified that the backpack was "zipped up" when he first pulled on it and in the process

_____

[3] The state does not challenge defendant's claim that the testimony at issue here goes to a material issue. We therefore do not address that question.

[4] On appeal, defendant also argues that the instruction was appropriate because another loss prevention officer "told the 9-1-1 operator that he saw a gun and he wrote in his report that he saw a gun" but then testified that he did not see a gun. But as defendant acknowledged at oral argument, he did not raise that argument below. He has not asked us to review as plain error and we therefore do not consider that argument on appeal.

of pulling on it, it became unzipped and he could see the contents of the bag. Lashbaugh wrote a report but did not include any information about the extent to which defendant's backpack was zipped.

At the close of evidence, defendant asked for the witness false-in-part instruction. In his view, "there could be no doubt that [Lashbaugh] was lying when he said that the merchandise was visible in the backpack before [Dennard] pulled on it." The court denied the instruction, concluding that Lashbaugh's testimony did not "rise[] to the level of manifest perjury" and that defendant could argue to the jury about any inconsistencies in Lashbaugh's testimony. Defendant did just that, arguing that Lashbaugh lied when he testified that the backpack was open.

On appeal, defendant contends that the trial court erred in denying his request for the witness-false-in-part instruction. In defendant's view, the instruction was appropriate because the evidence showed that Lashbaugh "consciously testified falsely" when he described the backpack as being unzipped enough to see the merchandise, testimony that contradicts Lashbaugh's and Dennard's statements that the backpack was zipped.

Viewed in the light most favorable to defendant, *see Payne*, 366 Or at 607, the evidence does not support the inference that Lashbaugh "consciously testified falsely." Lashbaugh testified that the backpack was "zipped up"; that testimony is not inconsistent with Lashbaugh's later testimony that the backpack was half-way or three-quarters zipped such that it supports the inference that he consciously testified falsely. A backpack is capable of many degrees of zipping, and "zipped up" is not always synonymous with "zipped completely closed." Thus, testimony describing in general terms that a backpack was "zipped up" is not necessarily inconsistent with later and more specific testimony that it was half-way or three-quarters of the way zipped, which describes with greater precision the degree to which the backpack was zipped up. At most, the variation in the descriptions of the degree to which the backpack was zipped—to the extent that there are variations—viewed in the light most favorable to defendant, suggests an imprecise

description, confusion, or differences in perspective. *See Payne*, 366 Or at 608 ("Considered in the light most favorable to the defendant, the complainant's repeated denials amount to more than an honest mistake, confusion, or hazy recollection."); *Kinstler*, 307 Or App at 523 (the "discrepancies, even when viewed in the light most favorable to [the] defendant, are of the type that suggest lapses in memory, differences in perspective, and, at worst, an example of a witness's selective choice of words to downplay his potential role"); *accord State v. Chemxananaou*, 319 Or App 636, 638, 510 P3d 954, *rev den*, 370 Or 303 (2022) ("Given that there was evidence that the witnesses made statements to police that directly contradicted their trial testimony on a material issue, we agree with defendant that the trial court erred in declining to give a witness false-in-part instruction."). The trial court thus properly declined to give the instruction.

Affirmed.

**HELLMAN, J.,** concurring.

I concur in the majority's well-written and legally correct opinion. I write separately to express my serious concern with the events that transpired here that culminated in Helmer's taking of defendant's cellphone and shoes from Smith.

I start with the most basic of legal principles: Officers need a warrant to enter homes and search for evidence. Failure to comply with that requirement can be excused in certain situations. Indeed, we have volumes of cases that address when the state can use evidence against a defendant even though officers obtained the evidence without a warrant. But our discussions in those cases should not be read to elevate the exceptions over the rule. It is important to remember that those cases only came before us because law enforcement officers took steps to circumvent the warrant requirements of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. I emphasize this at the outset because the officers here failed to comply with the warrant provisions of Article I, section 9 and the Fourth Amendment, and for reasons that are not entirely convincing to me.

I find it important to state another basic truth: Communication involves far more than just ones' spoken words. Our nonverbal actions or implied meanings behind phrases often have more force than the actual words themselves.

In considering this case, I was reminded of a scene from the 2004 Pixar Animation Studios movie "The Incredibles." Having been stripped of permission to serve humanity as a superhero, the main character, Mr. Incredible, takes a job as an insurance adjuster for a large corporation. His job, as we come to understand it, is really to deny claims. Any attempts to do otherwise are met with scorn and reprimand from his supervisor. Naturally, this does not align with Mr. Incredible's superhero, world-saving nature. When confronted with Mrs. Hogenson, a particularly sympathetic client, Mr. Incredible decides to help her anyway. But how can he do this? He starts by giving her a pen and paper and saying, "I'd like to help you, but I can't." He then goes on "I'd like to tell you to take a copy of your policy to Norma Wilcox, Norma Wilcox, W-I-L-C-O-X, on the third floor, but I can't. I also do not advise you to fill out and file a WS2475 form with our legal department on the second floor. I would not expect someone to get back to you quickly to resolve the matter." He concludes with "I'd like to help, but there's nothing I can do."

Did Mr. Incredible break the rules? Looking only at his words, he technically adhered to the requirements of his position—after all, he repeatedly said "I'd like to, but I can't." At the very least, he provided himself enough cover in case he was once again reprimanded for being too helpful to the clients. But the viewers—and more importantly Mrs. Hogenson—did not understand Mr. Incredible to be unhelpful. Instead, despite his words, we understand that his intent was for Mrs. Hogenson to take the policy to Norma Wilcox, fill out the WS2475 form, and actually get the insurance payout that she deserved.

I use this lighthearted example to make a very serious point. No matter how much we may have rooted for Mr. Incredible in the movie, that is not the way our law works. The warrant requirement is not a technical rule imposed by a greedy corporation—an unfair rule that causes us to cheer

when a hero finds a way around it. The warrant requirement stems from a right given to all citizens by the Oregon and United States constitutions. It exists to protect all citizens from government overreach. Law enforcement should not operate with a nod and a wink to the requirements of the law by reciting magic words while simultaneously finding ways to evade those requirements through a combination of experience, skill, and an understanding of basic human nature and communication.

There is an inherent risk of that kind of behavior when law enforcement works with private citizens in criminal investigations. That risk demands careful assessment of the entirety of the situation—what was said, what was conveyed, and what was agreed to. To be done correctly, such an assessment must take into account the complexities of communication, especially as it occurs between citizens and law enforcement.

I recognize that the Supreme Court's opinion in *State v. Sines*, 359 Or 41, 379 P3d 502 (2016), created an objective test to determine whether an agency relationship was established. But nonverbal communication and implied meaning can be assessed objectively, under the totality of the circumstances. Thus, I do not read *Sines* to eliminate the possibility that a court could find state action when an officer convinced a private citizen to act as their agent without giving an express directive. In fact, I find support in *Sines* for that possibility. *See id.* at 56 (noting that conduct that expresses meaning "includes, *but is not limited to*, written or spoken words" (citations omitted) (emphasis added)).

In my view, there are serious questions about whether Helmer's interaction with Smith established an agency relationship and made her a state actor. Helmer set the interaction in motion when defendant did not consent to a search of his apartment, and Helmer chose to go there without a warrant. I question Helmer's stated intent to confirm that the items were there before applying for a warrant. I have never understood that a judge would refuse to issue a warrant unless law enforcement confirmed the item's presence. I question the officers' failure to turn on a body camera, or otherwise record the encounter, which, in my view,

are important tools to protect both law enforcement and citizens. I question Helmer's choice to show Smith photographs of the items and to ask her questions, even though Helmer admitted that when he did so, people generally brought him the items in question. And I question Helmer's choice to accept the items, rather than to follow his stated intent and obtain a warrant once he confirmed their location. Indeed, the ease by which technology allows an officer to obtain a warrant highlights the concerns with the choices that were made here.

But as important as those questions are to me, we appellate judges have limits on our actions too. One of those limits is that we do not find facts on appeal.[1] Factfinding is the role of the trial court. Here, the trial court found that Smith acted "on her own volition." Under our law, then, she was not acting as an agent of the state. Would I have decided this case differently as a trial judge? Perhaps. Does that matter? No. Given the trial court's express finding of fact, which the record permitted, the majority is correct. I concur in the opinion.

---

[1] There are some narrow exceptions to this rule, but none of those circumstances are present in this case.