566 June 22, 2017 No. 33

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

JAMES EDWARD KELLER,
*Respondent on Review.*

(CC 110342882; A148749; SC S064353)

On review from the Court of Appeals.*

Argued and submitted March 9, 2017.

Doug M. Petrina, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Joshua B. Crowther, Chief Deputy Defender, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Brewer, Nakamoto, and Flynn, Justices.**

WALTERS, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____

** On appeal from Multnomah County Circuit Court, David F. Rees, Judge. 278 Or App 760, 379 P3d 545 (2016).

** Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case.

**WALTERS, J.**

A Washington State Trooper had probable cause to believe that defendant was violating Washington traffic laws and initiated a stop in Washington; however, the trooper did not complete the stop until both he and defendant had travelled across the state line into Oregon. In a subsequent prosecution for driving under the influence of intoxicants (DUII), defendant moved to suppress the evidence obtained as a result of the trooper's stop, arguing that the trooper had violated defendant's right to be free from unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution. We conclude that, although Oregon law did not grant the trooper authority to stop defendant in Oregon, the evidence was constitutionally obtained and admissible. We reverse the contrary decision of the Court of Appeals, *State v. Keller*, 278 Or App 760, 379 P3d 545 (2016), and affirm the circuit court's judgment of conviction.

## I.   FACTS

The parties agree on the facts. Thompson, a Washington State Trooper, was driving southbound on Interstate 5, in Washington, in an unmarked patrol car. When he was just north of the Interstate Bridge, Thompson saw, in his rearview mirror, a car driven by defendant approaching at a high rate of speed. He measured defendant's speed at 25 miles per hour over the posted speed limit. Thompson observed defendant's car approach his patrol car so closely that Thompson could no longer see the car's headlights in his rearview mirror. Defendant then moved into the left lane and accelerated past Thompson. Thompson had probable cause to believe that defendant had committed the Washington traffic violations of speeding and following another vehicle too closely and decided to initiate a traffic stop. He activated his emergency lights and began following defendant while both were still in Washington. Thompson intended to have defendant pull over near the next freeway exit, the Jantzen Beach exit, which was across the state border in Portland. When defendant did not stop, Thompson activated his siren and air horn. Defendant slowed down and moved into the right lane, but continued driving. Thompson used his public address system, and

defendant finally stopped on the shoulder of Marine Drive in Portland.

Before exiting his patrol car, Thompson asked Washington dispatch to contact the Portland police. Thompson then approached defendant's vehicle. He immediately noticed that defendant smelled of alcohol and had bloodshot, watery eyes, and slurred speech. Defendant told Thompson that he had consumed three beers. Thompson returned to his patrol car, requested the assistance of Portland police officers, and waited in his patrol car for the officers to arrive. Portland police officers arrived shortly thereafter and arrested defendant for the crime of DUII.

Defendant filed a pretrial motion to suppress the evidence obtained as a result of the traffic stop, arguing that Thompson's stop was not authorized by Oregon law and violated defendant's rights under Article I, section 9, of the Oregon Constitution. The trial court denied defendant's motion and convicted him after a stipulated facts trial. The Court of Appeals reversed, concluding that, although the stop was supported by probable cause, it violated Article I, section 9, because Thompson "acted without authority of law because, as an out-of-state officer, he had no authority to act in Oregon." *Id*. at 764. Therefore, the court explained, the seizure was "just as unreasonable as a traffic stop made without the requisite probable cause." *Id*. at 765. Chief Judge Hadlock filed a dissenting opinion. *Id*. at 766. Relying on *State v. Davis*, 313 Or 246, 834 P2d 1008 (1992), the dissent argued that the pertinent question was whether Thompson's actions "would have violated 'the standard of governmental conduct' or violated 'the scope of [defendant's] rights' had those actions been performed 'by Oregon police in Oregon,'" and that the correct answer was that they would not. *Keller*, 278 Or App at 768 (Hadlock, C.J., dissenting) (quoting *Davis*, 313 Or at 253). The dissent reasoned that an Oregon officer who stopped a motorist with probable cause to believe that the motorist was committing traffic offenses would not violate Article I, section 9. *Id*.

To consider those opposing views, we allowed the state's petition for review.

## II.   ANALYSIS

Article I, section 9, of the Oregon Constitution provides, in part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

The state argues that Thompson's stop did not violate Article I, section 9, for either of two reasons. First, the state argues that Article I, section 9, governs only the conduct of in-state governmental actors and their agents, and that Thompson was neither. The state acknowledges that, in *Davis*, this court stated that Article I, section 9, applies more broadly and prohibits the admission of illegally obtained evidence, no matter "what governmental entity (local, state, federal, or out-of-state) obtained it," 313 Or at 254 (emphasis removed), but the state asks that we limit *Davis* to its facts. In support of its position, the state cites *State v. Sines*, 359 Or 41, 379 P3d 502 (2016), a case in which this court held that the acts of a private citizen do not violate Article I, section 9, unless the private citizen is acting as an agent of the state.

Second, the state argues that, even if Thompson's stop implicated Article I, section 9, the question, under *Davis*, is whether his stop would have met constitutional muster had it been performed by Oregon officers. The state agrees with the dissent in the Court of Appeals that Thompson's stop met that standard: Thompson had probable cause to believe that defendant was committing a traffic violation and, had an Oregon officer stopped defendant under the same circumstances, the stop would have been lawful.

Because *Davis* is key to both of the state's arguments, it is with *Davis* that we begin. In *Davis*, Mississippi law enforcement officers arrested the defendant at his mother's home in Mississippi. 313 Or at 248. After the defendant's arrest, Portland police officers, who were present in Mississippi, questioned the defendant, who made incriminating statements. *Id*. The defendant filed a motion to suppress those statements, and the court considered whether they were the product of an unconstitutional arrest. The

trial court granted the defendant's motion because the officers had entered the defendant's mother's home pursuant to a fugitive warrant, but without a search warrant. *Id*. at 248-49. On the issue of whether the arrest warrant was sufficient to justify the officer's entry and subsequent questioning, this court reversed. *Id*. at 249. However, before reaching that conclusion, the court also addressed a preliminary question of significance here: whether Article I, section 9, applied to the actions of the Mississippi officers who made the arrest. *Id*. at 251-52.

In considering that question, the court noted, as background, that, in *Elkins v. United States*, 364 US 206, 80 S Ct 1437, 4 L Ed 2d 1669 (1960), the United States Supreme Court had abolished the so-called "silver platter doctrine." *Davis*, 313 Or at 252. That doctrine had permitted the admission of evidence obtained by state officers in violation of the Fourth Amendment because, prior to *Elkins*, the Court had reasoned that the Due Process Clause did not incorporate the Fourth Amendment, and, therefore, that state police action was not subject to Fourth Amendment scrutiny and sanction. *Id*. *Elkins* extended the protections of the Fourth Amendment to the states and held that evidence obtained in violation of the Fourth Amendment "is not admissible in state or federal court, regardless of where or by whom it was obtained." *Id*. at 252; *see also Ker v. California*, 374 US 23, 33-34, 83 S Ct 1623, 10 L Ed 2d 726 (1963) (holding in "cases involving federal constitutional rights, findings of state courts are by no means insulated against examination").

In *Davis*, this court declined to adopt a "state constitutional replica" of the silver platter doctrine that would require the admission of evidence obtained in violation of Article I, section 9. 313 Or at 252 n 6. The court decided that the introductory phrase of Article I, section 9, "[n]o law shall violate," defines the limits of governmental conduct generally, and that, "[i]f that constitutional right * * * is to be effective, it must mean that the government cannot obtain a criminal conviction through the use of evidence obtained in violation of a defendant's rights under that provision." *Id*. at 253.

Consequently, the court concluded that, in determining whether an out-of-state governmental search by a non-Oregon officer is unreasonable under Article I, section 9, "[t]he standard of governmental conduct and the scope of the individual rights protected by Article I, section 9, are precisely the same as those that would apply to a search by Oregon police in Oregon." *Id*. The court explained its conclusion as follows:

> "If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution. It does not matter *where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply."

*Id*. at 254 (emphases in original).

The following year, in *State v. Rodriguez*, 317 Or 27, 35, 854 P2d 399 (1993), the court followed *Davis* and held that Article I, section 9, applied to the acts of a federal officer acting under the authority of federal law. The court concluded that, like the defendant in *Davis*, the defendant in *Rodriguez* was entitled to the "broad protection granted to individuals under Article I, section 9." *Id*.

A.   *Whether Article I, Section 9, Governs the Actions of Out-of-State Officers*

With *Davis* in mind, we return to the state's first argument in this case—that Article I, section 9, should not govern the actions of an out-of-state officer unless, considering common-law agency principles, the officer was acting as an agent of this state. The state recognizes that that rule would place limitations on the applicability of that provision that are not found in *Davis*. The state correctly understands *Davis* to stand for the broader proposition that, when evidence is offered in an Oregon criminal prosecution, Article I, section 9, is applicable without regard to "*where* [the] evidence was obtained (in-state or out-of-state),

or *what* governmental entity (local, state, federal, or out-of-state) obtained it." 313 Or at 254 (emphases in original). However, the state asserts, that statement was not necessary to the result that the court reached in *Davis*; the state asks that we limit *Davis* to its facts and disavow its broader statements. In *Davis*, the state observes, Mississippi officers arrested the defendant on a fugitive warrant that was based on Oregon arrest warrants, and, although Oregon officers did not participate in the arrest, they were present when it occurred. *Id*. at 248-51. Thus, the state contends, the Mississippi officers seized the defendant with the involvement of Oregon authorities, and the court could have relied on common-law agency principles to hold that the actions of the Mississippi officers implicated Article I, section 9.

Although the state may be correct in its analysis of the facts of *Davis*, the consequence of adopting the rule for which it advocates would be the creation of a state silver platter doctrine. If Article I, section 9, did not govern the actions of out-of-state officers unless they were acting as agents of this state, then nonagent officers could violate that provision with impunity, and the evidence that they obtained as a result could be presented in an Oregon criminal prosecution on a "silver platter" that Oregon courts could not reject.

That consequence would be acceptable to the state. Rather than rejecting a state silver platter doctrine as we did in *Davis*, the state suggests that we revive a case decided before *Davis—State of Oregon v. Olsen*, 212 Or 191, 317 P2d 938 (1957). In *Olsen*, the question before the court was "whether or not the police officers of a sister state making an illegal search are to be treated as officers operating under the Constitution of the [S]tate of Oregon or as private individuals when appearing in a state court." *Id*. at 195. The court reasoned that the Washington officers who had conducted a search in Washington should not be treated as state officers, for purposes of the Oregon criminal prosecution, because

"[p]olice officers of the [C]ity of Spokane would have no authority to make a search under the laws of the [S]tate of Oregon or vice versa. The police officers of the [C]ity of Spokane are not in any manner amenable to the laws

of this state in arresting and searching a person in the [S]tate of Washington."

*Id*. Thus, the court concluded, the officers' actions "were done beyond the jurisdiction of this state and cannot be considered wrongful acts of the [S]tate of Oregon." *Id*.

After *Olsen* was decided, however, the United States Supreme Court decided *Elkins*, and, as noted, abolished the silver platter doctrine. That development, this court concluded in *State v. Krogness*, 238 Or 135, 137-38, 388 P2d 120 (1964), deprived *Olsen* of its force.[1] In *Davis*, the court did not cite *Olsen*, and took the position that the question before it was one of first impression:

> "This court has never squarely addressed whether the protections of Article I, section 9, of the Oregon Constitution apply in an Oregon prosecution that seeks to rely on evidence obtained as a result of the actions of out-of-state law enforcement officials while in another state, when those actions would violate Article I, section 9, if committed by Oregon law enforcement officials in Oregon."

313 Or at 251-52. The court then considered whether "to adopt a state constitutional replica" of the silver platter doctrine, and, mindful "of the historical fact that, during its relatively brief life, [that] doctrine was widely criticized on legal and policy grounds," declined the opportunity. *Id*. at 252 n 6.

Instead, the court determined that the right to be secure against unreasonable search or seizure is an individual right and that "[t]he standard of governmental conduct and the scope of the individual rights protected by Article I,

---

[1] The court apparently viewed *Olsen* as being decided based on the Fourth Amendment. The court explained:

> "The state argues that the illegality, if any, of the seizure cannot be a ground for suppressing the evidence in an Oregon court because the evidence was seized by police officers of the state of Washington. While this argument might have required discussion in former times (*see* [*Olsen*, 212 Or 191]), the fruits of illegal police conduct may no longer be used as evidence in state courts. [*Ker*, 374 US 23]; *Mapp v. Ohio*, 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 *** (1961). Such evidence is inadmissible whether seized by Oregon officers or by police of another jurisdiction. *Cf.* [*Elkins*, 364 US at 206]."

*Krogness*, 238 Or at 137-38.

section 9, are precisely the same as those that would apply to a search by Oregon police in Oregon." *Id*. at 253. This court's reasoning in *Davis* parallels the United States Supreme Court's reasoning in *Elkins* that, to a defendant, "it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." 364 US at 215. The Court explained that "[i]t would be a curiously ambivalent rule that would require the courts of the United States to differentiate between unconstitutionally seized evidence upon so arbitrary a basis." *Id*. We continue to find *Davis* persuasive, and we decline to exhume *Olsen* and adopt the state's suggested rule—a rule that would not vindicate the individual rights afforded by Article I, section 9.

We also disagree with the state's contention that this court's decision in *Sines* requires us to limit application of Article I, section 9, to officers of the state and those who act as their agents. In *Sines*, a housekeeper seized evidence of a crime in her capacity as a private citizen. 359 Or at 62. The court held that that evidence was not subject to suppression as the fruit of an unlawful governmental search because the housekeeper was not acting as an agent of the state. *Id*. "It is axiomatic," the court explained, "that Article I, section 9, applies only to government-conducted or directed searches and seizures, not those of private citizens." *Id*. at 50. In making that statement, the court did not specify that Article I, section 9, applies only to the conduct of *Oregon* state officials. Instead, it distinguished between "government-conducted or directed" searches and those by private citizens. *Id*. We made clear in *Davis* that out-of-state governmental conduct implicates Article I, section 9, and *Sines*'s discussion of when private, nongovernmental conduct also does so does not alter the conclusion that we reached in *Davis*. Following *Davis*, we conclude, in this case, that Thompson's stop of defendant constitutes state action for purposes of Article I, section 9.

B.   *Whether Thompson's Stop Violated Article I, Section 9*

We turn, next, to the state's second, alternative argument—that, even if Thompson was a state actor, his lack of authority does not render his stop unconstitutional. The state concedes that Thompson lacked *statutory* authority to

seize an Oregon citizen to enforce a noncriminal traffic violation, but contends that such a statutory violation does not require the exclusion of evidence.[2] The state explains that ORS 136.432 precludes the exclusion of evidence for statutory violations unless exclusion is required by the state or federal constitutions, certain rules of evidence, or the rights of the press.[3] *See State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010) (holding evidence obtained when police exceed statutory authority not suppressible unless it violates a constitutional rule); *State v. Holdorf*, 355 Or 812, 819, 333 P3d 982 (2014) (explaining that, after enactment of ORS 136.432, statutory framework relating to permissible scope of stop and frisk not at issue in determining whether evidence should be excluded). The state argues that *Davis* requires that we conduct our *constitutional* analysis as if Thompson were an Oregon officer, and that, by that measure, his actions did not violate Article I, section 9.

We understand the state's reasoning, but, when it gets to *Davis*, the state stops a step too soon. In *Davis*, the

---

[2] The state does not contend that Thompson had common-law authority to stop defendant. At common law, out-of-state officers had authority to enter another jurisdiction in fresh pursuit of a suspected fleeing felon. *See, e.g.*, *State v. Barker*, 143 Wash 2d 915, 921, 25 P3d 423 (2001) (noting common-law exception for fresh pursuit). The state does not rely on that authority here because, the state contends, common-law fresh pursuit authority has been superseded by statute. ORS 133.430(1) provides,

"Any member of a duly organized state, county or municipal peace unit of another state of the United States who enters this state in fresh pursuit, and continues within this state in such fresh pursuit, of a person in order to arrest the person on the ground that the person is believed to have committed a felony in the other state has the same authority to arrest and hold such person in custody as has any member of any duly organized state, county or municipal peace unit of this state to arrest and hold in custody a person on the ground that the person is believed to have committed a felony in this state."

Given the result that we reach in this case, we need not determine whether the state is correct in that regard.

[3] ORS 136.432 provides:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

Mississippi officers acted in Mississippi, with statutory authority from the State of Mississippi. 313 Or at 248. Therefore, the court did not confront the question whether out-of-state officers would violate Article I, section 9, if they acted in Oregon without Oregon statutory or common-law authority. In *Davis*, the court's inquiry was limited to "whether the protections of Article I, section 9, of the Oregon Constitution apply in an Oregon prosecution that seeks to rely on evidence obtained as a result of the actions of out-of-state law enforcement officials while in *another* state." *Id*. at 251-52 (emphasis added). In this case, Thompson was an out-of-state law enforcement official who acted in this state without authority to do so. This case requires us to determine whether that lack of authority made his seizure of defendant unconstitutional under Article I, section 9.

Other courts have confronted similar questions with differing results. Most courts approach this issue in one of four ways. A number of jurisdictions hold that statutorily unauthorized arrests are *per se* unconstitutional. One of those jurisdictions is the State of Washington. *State v. Barker*, 143 Wash 2d 915, 25 P3d 423 (2001). In *Barker*, an Oregon officer pursued the defendant into Washington and detained him until a Washington trooper arrived and arrested him for DUII. *Id*. at 918. The Washington Court of Appeals held that, although the stop violated Washington statutory law, it did not violate the Washington constitution because the officer had probable cause to arrest. *Id*. at 919. The Washington Supreme Court disagreed, holding that, where an officer lacks statutory or common-law authority to arrest, the existence of probable cause alone does not render the stop constitutionally valid. *Id*. at 922. The court reasoned that "Article I, section 7 *** is not a source of authority of law to arrest or stop and detain a person in Washington. There must be some other source of authority of law for a constitutional warrantless arrest." *Id*. at 921; *see also State v. Cuny*, 257 Neb 168, 173, 595 NW2d 899, 903 (1999) (holding stop of defendant in Nebraska by South Dakota officers violated federal and state constitutions because officers lacked Nebraska authority to stop); *Com. v. Hernandez*, 456 Mass 528, 532, 924 NE2d 709, 712 (2010) (holding exclusion of evidence is "an appropriate remedy when a defendant is

prejudiced by an arrest made without statutory or common-law authority").

The second approach that jurisdictions follow is what may be termed the "private citizen" approach. Using that approach, courts hold that police officers who conduct extraterritorial searches and seizures should be treated as private citizens. In those jurisdictions, the law pertaining to citizens' arrest determines the legality of the officer's action. If the officer, viewed as a private citizen, had statutory or constitutional authority to make the arrest, then those courts conclude that the arrest was constitutional. *See, e.g.*, *People v. Lacey*, 30 Cal App 3d 170, 176, 105 Cal Rptr 72, 77 (1973) (holding United States marshal authorized, as a private person, to arrest defendant); *Williams v. State*, 171 Ga App 807, 809, 321 SE2d 386, 389 (1984) (holding arrest conducted by DEA special agent without authority was a lawful citizen's arrest); *State v. McDole*, 226 Mont 169, 173, 734 P2d 683, 685 (1987) (holding police officer authorized to make warrantless arrest of the defendant outside his jurisdiction in capacity as private citizen).

A third group of jurisdictions applies a pure "constitutional" analysis. Courts in those jurisdictions do not consider violations of state statutes dispositive and instead consider only whether the seizure or arrest was constitutionally justified under federal or state constitutional law. In such jurisdictions, the fact that the officer lacked statutory authority is irrelevant to the constitutional analysis. Thus, for instance, in *State v. Mangum*, 30 NC App 311, 313, 226 SE2d 852, 853 (1976), the defendant was arrested three miles outside of the officer's territorial jurisdiction. The defendant moved to suppress the resulting evidence, and, on appeal, the North Carolina Court of Appeals held that a violation of the jurisdictional statute did not necessarily require exclusion of the evidence. *Id*. at 315, 854-55. The court concluded that the arrest was valid under the Fourth Amendment because the officer had constitutionally justified probable cause to arrest the defendant. *Id*. at 314-15, 854; *see also Virginia v. Moore*, 553 US 164, 128 S Ct 1598, 170 L Ed 2d 559 (2008) (holding police officer does not violate Fourth Amendment by making arrest supported by

probable cause); *State v. Smith*, 154 NH 113, 116-18, 908 A2d 786, 789-90 (2006) (holding extrajurisdictional stop did not violate state constitution where officers had reasonable suspicion for stop and stop lasted no longer than necessary); *Madsen v. Park City*, 6 F Supp 2d 938, 945 (ND Ill 1998) (holding stop without statutory authority violates Fourth Amendment only if it is "without probable cause or [the officer] violated some other constitutional prohibition").

A fourth subset of jurisdictions has adopted a version of the constitutional approach that requires an examination of whether the extrajurisdictional aspect of the arrest was itself reasonable. Some courts in those jurisdictions look to whether the arresting officer was assisted by local officers. Others consider whether there was a compelling reason for the officer to conduct the arrest outside of his or her territorial jurisdiction. For instance, in *People v. Hamilton*, 666 P2d 152, 156-57 (Colo 1983), the Colorado Supreme Court held that an arrest, although carried out by officers acting outside their jurisdiction, was not so unreasonable as to violate the defendant's constitutional rights because the arresting officers contacted the local authorities after detaining the defendant, the warrant established constitutionally significant probable cause, and, although the officers were not in fresh pursuit, there was a possibility that the defendant would have completed his business at the location reported by an informant before the other officers arrived. As another example, in *State v. Baton*, 488 A2d 696, 700 (RI 1985), the Rhode Island Supreme Court upheld an extrajurisdictional arrest because the arresting officer had probable cause and conducted the arrest "under the aegis of" an officer with authority to effectuate the arrest. That officer, the court said, "was present at the scene and actively involved in the search for defendant." *Id*.

Although neither the state nor defendant explicitly addresses the differing approaches that other courts have taken when confronted with an extrajurisdictional arrest, the state seems to argue that this court should adopt the pure "constitutional" approach. The state contends that whether an out-of-state officer had authority to make a stop is irrelevant to whether the stop was constitutional. Thus,

in this instance, the state argues, the pertinent inquiry is solely whether Thompson had the requisite constitutional justification—probable cause—to stop defendant. Defendant, on the other hand, argues that we should go the route of the State of Washington and hold that, in addition to requiring a sufficient quantum of suspicion, Article I, section 9, requires that the out-of-state officer act with statutory or common-law authority. In addition, defendant asserts, authority to stop is a constitutional requirement. Thus, both parties recognize that *Davis* provides a baseline for our Article I, section 9, analysis. Under *Davis*, the actions of an out-of-state officer meet the dictates of Article I, section 9, only if they would satisfy the requirements of that provision if performed by an Oregon officer. 313 Or at 253.[4]

The more difficult question, which *Davis* does not answer, however, is whether Article I, section 9, includes an additional consideration. When an out-of-state actor lacks statutory or common-law authority, is that lack of authority constitutionally irrelevant, as the state claims? Or is it determinative, as defendant would have it? To answer those questions, both parties rely on the text of Article I, section 9, and its prohibition of unreasonable searches and seizures. The state asserts that an out-of-state officer's traffic stop is reasonable if it would be so if performed by an Oregon officer, and that the sole measure of the reasonableness of a traffic stop is whether it is justified by probable cause. Defendant asserts that no seizure, whether by an in-state or out-of-state officer, is reasonable unless the officer is acting with common-law or statutory authority. Citing *State v. Atkinson*, 298 Or 1, 8-9, 688 P2d 832 (1984), defendant contends that the first step in analyzing the reasonableness of a seizure, "is to determine the source of the authority for the custody." In support of that proposition, defendant also cites *State v. Bridewell*, 306 Or 231, 239, 759 P2d 1054 (1988) (suppressing evidence discovered when deputies entered defendant's premises without authority), and *Nelson v. Lane County*, 304

---

[4] In making its first alternative argument that we limit *Davis* to its facts and return to the reasoning of *Olsen*, the state would have us adopt the "private citizen" approach that some courts have taken. In rejecting that argument, we confirm that we view the actions of out-of-state governmental actors as if they were the acts of in-state governmental actors, not as if they were private citizens.

Or 97, 106, 743 P2d 692 (1987) (concluding plaintiff entitled to declaratory judgment because administrative stop and seizure not authorized).

We begin with defendant's argument and reject it. We are not convinced that a lack of Oregon common-law or statutory authority makes a seizure *per se* unreasonable under Article I, section 9. We acknowledge that this court has adopted certain categorical rules defining unreasonableness, for example, the rule that, "subject to certain specifically delineated exceptions," warrantless searches are *per se* unreasonable. *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015). But the cases that defendant cites do not persuade us that a lack of common-law or statutory authority is one of those categorical rules. As noted, ORS 136.432 precludes the exclusion of evidence for lack of statutory authority, and none of the cases that defendant cites concern a lack of *statutory or common-law* authority. Instead, all address the *constitutional* authority of Oregon officers. As we explained in *Rodgers/Kirkeby*, for such officers, constitutional "authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, non-criminal activity, *viz.,* a traffic infraction." 347 Or at 623. In *Bridewell*, *Atkinson*, and *Nelson*, by contrast, neither a warrant nor another source of constitutional authority justified the Oregon officers' conduct. In *Bridewell*, the officers lacked a warrant, and no exception to the warrant requirement applied. *Atkinson* and *Nelson* both concerned the constitutional justification necessary for an administrative search, and the court explained that

> "an administrative search conducted without individualized suspicion of wrongdoing could be valid if it were permitted by a 'source of the authority,' that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority, and if it were carried out pursuant to 'a properly authorized administrative program, designed and systematically administered' to control the discretion of non-supervisory officers."

*Nelson*, 304 Or at 104 (citing *Atkinson*, 298 Or at 9-10). Those cases do not demonstrate that Oregon courts have recognized a categorical requirement of common-law or statutory authority to render a stop constitutional.

That does not mean, however, that an officer's unauthorized stop necessarily will meet the requirements of Article I, section 9. That constitutional provision imposes limits on searches and seizures "in order to prevent arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals." *State v. Tourtillott*, 289 Or 845, 853, 618 P2d 423 (1980) (citing *United States v. Martinez-Fuerte*, 428 US 543, 554, 96 S Ct 3074, 49 L Ed 2d 1116 (1976)). There may be scenarios in which an officer acts without common-law or statutory authority and that lack of authority could render the officer's actions arbitrary and oppressive and violative of Article I, section 9. We often look to the totality of the circumstances to determine whether a search or seizure was constitutionally unreasonable, *State v. Unger*, 356 Or 59, 84, 333 P3d 1009 (2014), and we deem it appropriate to do so in this instance as well. Because Article I, section 9, requires, in addition to constitutional justification, that a stop be reasonable, we are convinced that we should follow the lead of those jurisdictions that require that the extraterritorial aspect of a stop by an out-of-state officer be reasonable.

In this case, we conclude that Thompson's stop of defendant did not violate Article I, section 9. First, neither party argues that the stop would have violated that provision had it been conducted by an Oregon officer. Thompson had probable cause to stop defendant, and an Oregon officer making a stop in that circumstance would have had sufficient constitutional justification for the stop.[5] Second, the extrajurisdictional aspect of the stop was reasonable. Thompson's actions were reasonable at each step of his encounter with defendant. Thompson observed defendant commit traffic violations in Washington and activated his emergency lights to initiate the traffic stop when he and defendant were just north of the state line, entering the Interstate Bridge.

---

[5] At oral argument, defendant raised, for the first time, the argument that the Washington trooper did not have probable cause to believe that defendant had committed a traffic violation in *Oregon*. According to defendant, the record establishes only that the trooper had probable cause to believe that defendant had committed traffic violations in *Washington*. We do not address that argument because it is unpreserved, but we note that there may be limitations, not reached in this case, on the nature of the probable cause justifying a traffic stop by an out-of-state officer acting in Oregon.

Thompson stopped defendant at the earliest opportunity, just over the Oregon border. After he had successfully stopped defendant, but before exiting his patrol car, Thompson asked Washington dispatch to notify the Portland police of the stop. After Thompson contacted defendant and developed reasonable suspicion that defendant had committed the crime of DUII, Thompson requested the assistance of Portland police officers and waited in his patrol car for them to arrive. The circumstances of the stop required Thompson to either decline to pursue defendant, who had committed multiple traffic violations, or stop defendant as close to the Washington border as was feasible. Thompson did not act unreasonably in pursuing the latter option. Furthermore, Thompson quickly involved the Portland police and left the DUII investigation for the local authorities.

The stop was one that an Oregon officer could have effected without violating Article I, section 9, and the extra-jurisdictional aspect of the stop was not unreasonable. The stop did not violate Article I, section 9, and suppression of the evidence obtained as a result of the DUII investigation is not required.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.