Submitted September 24, reversed and remanded December 16, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARK DOUGLAS DALY,
*Defendant-Appellant.*

Linn County Circuit Court
17CR11537; A170067

479 P3d 335

Defendant appeals from a judgment of conviction for fourth-degree assault. Defendant contends that the trial court erred in declining to give defendant's requested witness-false-in-part jury instruction. *Held*: The court erred in failing to give defendant's requested jury instruction, because there was sufficient evidence for the jury to determine that at least one witness consciously testified falsely. Furthermore, that error was not harmless.

Reversed and remanded.

David E. Delsman, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Nora Coon, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Joanna Hershey, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Defendant appeals from a judgment of conviction for fourth-degree assault, ORS 163.160. Defendant raises two assignments of error. First, defendant contends that the trial court erred in declining to give defendant's requested witness-false-in-part jury instruction. Second, defendant assigns error to the court's imposition of $1,212.21 in restitution. Because there was sufficient evidence for the jury to determine that a witness consciously testified falsely, we conclude that the court erred in failing to give defendant's requested jury instruction. Consequently, we reverse defendant's conviction and remand for a new trial, and we do not reach defendant's second sentencing-related error.

Defendant was charged with assault in the fourth degree for allegedly punching Thomas, defendant's neighbor, several times. Defendant and Thomas each resided in motor homes on the same property. Multiple other individuals lived in motor homes on that property, including a person named Warren, who owned the motor home where the alleged attack occurred. At trial, Thomas, Warren, and the responding deputy testified on behalf of the state.

Thomas testified that, on an evening in January 2017, he was inside Warren's motor home with Warren and several others. At around 7:00 p.m., defendant came to the outside of the motor home because he wanted to talk to a woman who was inside. Defendant was "screaming and yelling" and "banging on the door." Thomas opened the door and told defendant that he was not allowed inside. Defendant attacked Thomas, who described the attack as follows:

> "And at that point I remember [defendant] leaning in, pointing at her, saying that she owed him 50 bucks. At that point I turned to tell her to back up and go towards the back, and that's when [defendant] came in, [and] pushed me down. *** I didn't even turn back around. Pushed me down and just started beating on me. Pinned me to the floor."

According to Thomas, defendant punched him several times on the side of his face. During that time, Thomas unsuccessfully attempted to remove a knife that Thomas carried in his back pocket. Warren intervened and separated defendant from Thomas. Thomas then stood, pulled

the knife from his pocket, and told defendant that "if [defendant] came back in [Thomas would] kill him." Thomas received treatment for his injuries at a hospital. Warren testified after Thomas and described substantially the same version of events.

Defendant contended that he acted in self-defense. During defendant's case-in-chief, defendant called Thomas to testify for the second time.[1] Defendant asked Thomas a series of questions about a woman named Kessler, who was one of the witnesses set to testify later in the trial on defendant's behalf. Defendant asked Thomas whether he had contacted Kessler with respect to her forthcoming testimony.

"[DEFENDANT]:   Have you had contact with one of my witnesses, Lorene Kessler, in any way, shape or form[?]

"[THOMAS]:    She has been a friend of mine. She helped me move in my apartment. The only thing I ever told her was to just tell the truth and she'd be fine.

"[DEFENDANT]:   Did you ever threaten her if she did testify?

"[THOMAS]:   Threaten her? No. But she sure threatened me a few times [o]n your behalf.

"[DEFENDANT]:   Did you threaten her through anybody else, a third party?

"* * * * *

"[THOMAS]:   I have no idea who the third party would be. Like I said, we have different friends.

"* * * * *

"[DEFENDANT]:   Did you send her any kind of text at all about this trial?

"[THOMAS]:   Throughout the last year and a half?

"[DEFENDANT]:   Anything negative?

"[THOMAS]:   I told her to sit there and be careful because, I told her that—well, I'm not going to go there. But I have never—that's the only thing negative I said was that she needed to be careful and just tell the truth. But this is after she texted me a few times [o]n your behalf."

---

[1] Defendant represented himself at trial.

Kessler subsequently testified on behalf of defendant. Kessler explained that she was with defendant in his motor home the night of the alleged assault. Kessler watched from outside defendant's motor home when defendant approached Warren's motor home, "[a]bout 20 feet or 30 feet" away. According to Kessler, Thomas "put his hand across the door frame" to prevent defendant from entering. Kessler testified that, at that point—before defendant hit the victim—Kessler saw a knife in Thomas's hand. She left before the alleged assault occurred. Kessler also testified that Thomas had threatened her in advance of trial, contrary to Thomas's assertion that he had not. Kessler read into the record several text messages that she purportedly received from Thomas.

"[DEFENDANT]:   Have you received any threatening messages from Mr. Thomas regarding this trial?

"[KESSLER]:   Yes, I have.

"* * * * *

"[DEFENDANT]:   Okay. What—what did they say?

"[KESSLER]:   'Lorene, just a word of advice. Tell the truth. Remember, [defendant] threw away his own family. He will do the same to you *** in a heartbeat, *** to stay out of the jail.'

"[DEFENDANT]:   Any other?

"[KESSLER]:   Yes. There's an email, it was on February 6th, 2018, and it says, 'You are just like [defendant], why bother with the truth while a lie is so much easier and you make—and make[s] you feel so good about hurting someone else.'"

Kessler also described other messages that Thomas had allegedly left in Kessler's voicemail. Kessler did not play those messages aloud in court but described the tone as insulting and aggressive.

"[DEFENDANT]:   Did he leave any messages, threaten you or threaten somebody to cause you harm?

"[KESSLER]:   He said after the 19th of the month there was no holds barred on this situation, on this case.

"[DEFENDANT]: Did he—did he tell you who might beat you up if you testified?

"[KESSLER]: He said that Jerica is going to beat me up if I testified today."

Based on Kessler's testimony that Thomas had threatened her prior to the trial, defendant requested the uniform witness-false-in-part instruction, Uniform Criminal Jury Instruction (UCrJI) 1029.[2] Defendant argued that the instruction was appropriate because Thomas's testimony that he had not threatened Kessler was inconsistent with Kessler's testimony that Thomas had sent her threatening text messages and voicemails. The court denied defendant's request.

"I don't find that that's necessarily a factual dispute, I think that's something that she could have interpreted * * * as a threat. To my ear it didn't really sound threatening, it said, 'Tell the truth,' that kind of thing. So I will not give the Witness False in Part."

The jury found defendant guilty as charged, and defendant was convicted of assault in the fourth degree.

On appeal, defendant argues that the trial court erred in declining to give defendant's requested instruction. Defendant contends, as he did at trial, that there was sufficient evidence for the jury to determine that either Thomas or Kessler had testified falsely with respect to the threats allegedly made by Thomas in advance of Kessler's testimony on behalf of defendant. The state responds that the court correctly determined that the instruction was inappropriate

---

[2] UCrJI 1029 provides:

"Sometimes a witness may give incorrect or even inconsistent testimony. This does not necessarily constitute lying on the part of the witness. The witness's testimony may be an honest mistake or confusion. The witness may simply forget matters, or his or her memory of an event may contain honest inconsistencies or contradictions. Also, different witnesses may observe or recount the same event differently.

"However, if you find that a witness has intentionally lied in part of his or her testimony, you may, but are not required to, distrust other portions of that witness's testimony.

"As jurors, you have the sole responsibility to determine which testimony or portions of testimony you will or will not rely on in reaching your verdict."

in this case.[3] The state argues that is so because the record does not demonstrate that Thomas had consciously testified falsely. In the state's view, the record demonstrates that Thomas and Kessler merely had differing recollections and interpretations of Thomas's statements. The state also argues that any error in failing to give the witness-false-in-part instruction was harmless.

The witness-false-in-part jury instruction is one of several statutory instructions provided for in ORS 10.095, which establishes a number of jury instructions that a trial court must give under certain conditions. Under that statute, a court is required "on all proper occasions" to instruct the jury "[t]hat a witness false in one part of the testimony of the witness may be distrusted in others." ORS 10.095(3). After the present case was submitted for appeal, the Supreme Court decided *State v. Payne*, 366 Or 588, 468 P3d 445 (2020) (*Payne II*). In *Payne II*, the court considered what constitutes a "proper occasion" for the witness-false-in-part jury instruction under ORS 10.095. The court determined that a "'proper occasion' to give the witness-false-in-part instruction exists when, considering the testimony and other evidence a party has brought to the court's attention in support of the requested instruction, the trial court concludes that sufficient evidence exists for the jury to decide that at least one witness consciously testified falsely and that the false testimony concerns a material issue." *Id*. at 600. Evidence of a witness's false testimony must "amount to more than an honest mistake, confusion, or hazy recollection." *Id*. at 608.

The Supreme Court also concluded that, when reviewing a trial court's refusal to give the instruction, the appellate court should apply a legal-error standard of review. *Id*. at 606-07. In so concluding, the court overruled its holding in *Ireland v. Mitchell*, 226 Or 286, 359 P2d 894 (1961), that directed appellate courts to review a refusal to give the witness-false-in-part instruction for abuse of discretion.

---

[3] On appeal, the state does not argue that the requested witness-false-in-part instruction was incomplete or an incorrect statement of the law. The state only argues that the record was not sufficient to demonstrate that the victim consciously testified falsely.

*Payne II*, 366 Or at 606-07. The court also affirmed that "a trial court and a reviewing court must view the evidence in the light most favorable to the party requesting the instruction." *Id*. at 607.

Thus, in accordance with *Payne II*, we must determine whether the testimony and evidence at trial, viewed in the light most favorable to defendant, is legally sufficient to support a finding that one or more witnesses consciously testified falsely and, if so, whether that false testimony bore on a material issue. *State v. Kinstler*, 307 Or App 517, 521, 478 P3d 595 (2020).

Turning to the record in this case, we first look to whether, viewing the evidence in the light most favorable to defendant, there was sufficient evidence for the jury to decide that Kessler or Thomas testified falsely. We conclude that there was. Here, Thomas repeatedly denied making threatening statements to Kessler. In contrast, Kessler testified that Thomas had sent her multiple threatening text messages and voicemails, including one voicemail during which Thomas stated that a person named "Jerica" would "beat [Kessler] up."

We agree with the trial court that several of the messages that Kessler described were not directly threatening and thus not sufficient to prove that either Kessler or Thomas were consciously testifying falsely. For example, Kessler testified that Thomas sent messages in which he insulted defendant, accused Kessler of lying, and told her to "[t]ell the truth." Even viewed in the light most favorable to defendant, those messages fail to demonstrate anything more than hostility between the parties. The inconsistency between Kessler's assertion that those messages were threats and Thomas's assertion that they were not amounts to evidence of a conflict between those witness's perceptions of the messages, not evidence sufficient to prove that either witness consciously testified falsely.

However, that reasoning does not apply to Thomas's alleged statement to Kessler that "Jerica" would "beat [her] up" if she testified at trial. That statement was sufficient to constitute evidence that one of the witnesses had consciously testified falsely when considered in conjunction with

Thomas's testimony that he had not threatened Kessler, and in particular with his testimony that he did not threaten her through a third party because the two "ha[d] different friends" and he "ha[d] no idea who the third party would be." Considered in the light most favorable to defendant, that evidence could support a jury's determination that either Kessler or Thomas had consciously testified falsely about whether Thomas had threatened Kessler through a third party.

That testimony was also material. As noted, defendant's trial strategy was to argue that he had acted in self-defense. That argument rested heavily on Kessler's testimony that Thomas possessed a knife and held it in his hand prior to the attack. The testimony of Thomas and Warren directly contradicted Kessler's statements—both testified that Thomas only retrieved the knife after defendant had attacked Thomas. Whether Thomas or Kessler lied bore directly on the strength of defendant's self-defense strategy.

Lastly, we must determine whether the trial court's error in failing to give the instruction was harmless. The erroneous denial of defendant's requested instruction was harmless, and we must affirm defendant's conviction, if there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003). In determining whether the court's error in failing to give a requested jury instruction was harmless, we consider "the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *State v. Ashkins*, 357 Or 642, 660, 357 P3d 490 (2015).

The state argues that the error was harmless here because the instruction concerns common sense principles and the trial court gave "general instructions on evaluating witness testimony" that "adequately informed the jury of its duty to assess the victim's credibility, including consideration of any inconsistent testimony." The state relies on our opinion in *State v. Payne (A166061)*, 298 Or App 438, 447 P3d 71 (2019) (*Payne I*), which was reversed by the Supreme Court in *Payne II*, as noted above, after this case was submitted

for appeal. In reversing *Payne I*, the Supreme Court rejected the state's argument here. The court explained that the witness-false-in-part instruction serves an important advisory function, and, "if we accepted that the general instructions served the same function as the witness-false-in-part instruction," there "would never be a case in which the failure to give that instruction could be more than harmless error." *Payne II*, 366 Or at 610. Furthermore, ORS 10.095 "reflects a legislative judgment"—that the witness-false-in-part instruction has value—"that we are not free to ignore." *Id*.

Considering the trial court's error in the context of the record and the parties' arguments, we cannot conclude that there was little likelihood that the error affected the verdict. As we explained above, defendant's trial strategy was to argue that he had acted in self-defense because Thomas held a knife in his hand prior to defendant's attack. Kessler testified that she saw Thomas holding the knife, but Thomas and Warren testified that Thomas only removed the knife after defendant attacked him. In determining which version of events to believe, the jury was necessarily required to assess the veracity and weight of each witness's testimony. If the jury had been properly instructed and concluded that Thomas or Kessler lied about the alleged threats in advance of trial, it might have regarded either of those witness's testimony as more or less persuasive.

We note that the jury could have reached the same conclusion had it received defendant's requested instruction, and indeed may on remand. Kessler's testimony concerning the knife was also contradicted by Warren's testimony, and, at trial, the state argued that Kessler's testimony was unreliable given her distance from the attack. However, the "correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *Davis*, 336 Or at 32. Considering the importance of each witness's testimony to the parties' competing theories at trial, we cannot say that the error had little likelihood of affecting the verdict.

In sum, viewing the evidence in the light most favorable to defendant, there was sufficient evidence at trial for the jury to determine that either Thomas or Kessler consciously testified falsely as to whether Thomas threatened Kessler in advance of trial. Therefore, the trial court's failure to give defendant's requested jury instruction was error. We further conclude that that error was not harmless.

Reversed and remanded.