Submitted on remand from the Oregon Supreme Court September 8, affirmed October 20, 2021, petition for review denied February 3, 2022 (369 Or 211)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ZAIRE MALIK GOCAN,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR33263, 16CN06231, 17CN02403;
A167173 (Control), A166483, A166484

500 P3d 85

This case is on remand from the Oregon Supreme Court. Defendant appeals from a judgment of conviction for endangering a person protected by a Family Abuse Prevention Act (FAPA) order, a judgment of contempt for violating a FAPA order, and a judgment revoking his probation. On appeal, defendant challenged the trial court's decision to not give the statutory witness-false-in-part jury instruction in his criminal trial. The Court of Appeals affirmed the trial court in a per curiam decision, which the Supreme Court vacated and remanded for reconsideration in light of *State v. Payne*, 366 Or 588, 468 P3d 445 (2020). *Held*: Under the standard announced in *Payne*, defendant failed to point to evidence at trial sufficient to support an inference that a witness consciously testified falsely about a material issue. Thus, the trial court did not err in refusing to give the witness-false-in-part jury instruction.

Affirmed.

On remand from the Oregon Supreme Court, *State v. Gocan*, 368 Or 510, 491 P3d 800 (2021).

Eric J. Bergstrom, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stacy M. Du Clos, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the briefs for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

This case is on remand from the Supreme Court. Defendant appeals from a judgment of conviction for endangering a person protected by a Family Abuse Prevention Act (FAPA) order, a judgment of contempt for violating a FAPA order, and a judgment revoking his probation. On appeal, defendant raises a single assignment of error, challenging the trial court's decision to not give the statutory witness-false-in-part jury instruction, ORS 10.095(3), in his criminal trial.[1] We affirmed the trial court in a per curiam decision, citing our case in *State v. Payne (A166061)*, 298 Or App 438, 447 P3d 71 (2019) (*Payne I*), *rev'd*, 366 Or 588, 468 P3d 445 (2020). The Supreme Court took *Payne I* under review and reversed our decision, *State v. Payne*, 366 Or 588, 468 P3d 445 (2020) (*Payne II*). The Supreme Court has now vacated and remanded this case to us for reconsideration in light of *Payne II*. On reconsideration under the standard announced in *Payne II*, we conclude that the trial court did not err in refusing to give the witness-false-in-part jury instruction and affirm.

A jury found defendant guilty of one count of endangering a person protected by a FAPA order, constituting domestic violence (Count 1), and acquitted him of endangering a person protected by a FAPA order, constituting domestic violence (Count 5), two counts of coercion, constituting domestic violence (Counts 2 and 6), menacing, constituting domestic violence (Count 3), and strangulation, constituting domestic violence (Count 7). Those charges were based on two incidents in May 2017 between defendant and AD, the protected person. Counts 5, 6, and 7 were based on conduct occurring on May 19, 2017, and Counts 1, 2, and 3 were based on conduct occurring May 22, 2017.

---

[1] In a supplemental assignment of error, defendant argues that the court plainly erred in instructing the jury that it need not reach unanimous verdicts and contends that, because providing the erroneous jury instruction constituted structural error, his conviction must be reversed in light of *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020). Here, defendant was convicted on Count 1 by a unanimous jury, and, on that basis, we reject defendant's arguments. *State v. Flores Ramos*, 367 Or 292, 319, 478 P3d 515 (2020); *State v. Chorney-Phillips*, 367 Or 355, 359, 478 P3d 504 (2020).

Defendant and AD began an intimate relationship in August 2016 and, in November of that year, AD obtained a FAPA restraining order against defendant that prohibited him from contacting her and from going to her school, place of business, or residence. Despite that order, defendant and AD continued their intimate relationship.

At trial, AD recounted the events of May 22, 2017. She testified that defendant went to her place of employment and proceeded to put dents in her car, which was parked in the parking lot, because she would not come outside. When AD's shift ended, she approached defendant and defendant said, "Should I slap you now or later? Get in the car." AD got in the driver's seat of the car and drove with defendant in the car, scared that he would slap her, because defendant gets angry and physically violent if she does not listen to him. While in the car, defendant was yelling at AD and making violent gestures. He also took her phone and purse, which he "always" does. However, instead of driving downtown as requested by defendant, AD was able to "trick" him into letting her drive to her mother's house. Once there, she got some of her things back and went inside, and her sister called the police. AD went outside and told defendant that the police were on the way. She was able to get more of her things back, but defendant kept her social security card. Defendant proceeded to pour bleach that was sitting in the car over the inside of AD's car and then "took off running." AD followed defendant in her car and located him about three blocks away. She then flagged down the responding police officer to show him where to find defendant. Defendant started to run when he saw the police, who ultimately located and arrested him.

In recounting those events, AD also explained why she may be inconsistent at times:

"[AD]: And just to clarify, like, I don't know if it's appropriate, but the attorney right over there, he said that I have three different stories. I apologize about that. I just—so much has happened, and I have been dealing with this man causing physical harm with me every single day. And things are repeat things. It's not the first time he's taken my phone, it's not the first time he puts his hands on

me, it's not the first time he's punched me, it's not the first time he's held me hostage at work, school, whatever.

"* * * * *

"And so if things are confused or not making sense, I apologize. So much has happened, and I've been going through this for a very long time, that there's so many things that have happened. And I just—

"[PROSECUTOR]:  Okay. Thank you. Do you feel like things are a little bit clearer in your mind now?

"[AD]:  No. I've been working on trying to heal and just get past this. And part of healing is being here today."

AD then testified about the events that happened three days earlier, on May 19. On that day, she and defendant were staying at a Motel 6, and defendant became angry when he wanted to borrow her car, but she needed it to get to work. Defendant took her phone and keys, yelled at her, threw her on the bed, pinned her down, and put a pillow over her face, covering her nose and mouth, for about 30 seconds. AD kept saying "I love you" to get him to stop. Eventually, defendant got up and left the room. AD testified that she then left the room and, once outside, defendant threw a drink on her. She went to the motel office, and she and the motel clerk stepped outside. Defendant threatened to take AD's car, and the motel clerk told him that that would be "grand theft auto." At the same time, the clerk started to call the police, at which point defendant gave AD her phone and keys and returned to the room, and AD left for work in her car. AD testified that she did not contact police about the incident because "[n]othing ever happens" when police are contacted about her and defendant. A witness for defendant testified that he could not find a record of anyone calling 9-1-1 in relation to the incident.

During cross-examination, AD admitted that she did not tell the police, or mention before testifying that day, that defendant had poured bleach in her car on May 22. After testifying on direct examination that the FAPA order remained in place, AD answered on cross-examination that she had gone to court to get the order removed, but, then, on redirect, clarified that she had not gone to court, but only

told defendant that she would seek to remove the order. AD also denied telling one of the police officers on May 22 that the incident that day started at her school, denied telling another police officer that the first time she saw defendant that day was at her mother's house, and denied testifying to the grand jury that defendant had taken her social security card two weeks before May 22. She also denied having access to defendant's bank accounts, but then acknowledged that she has had permission from defendant to use his account before if he is in jail and needs something; she denied having a joint or shared account.

Additionally, two police officers who had spoken to AD on May 22, while she was in her car, testified that she did not mention bleach being poured in her car, and neither officer remembered smelling bleach. One officer also testified that he spoke with AD for a few minutes, and AD had told him she was at her mother's house when defendant showed up that day and that she had been the one who called the police.

At the close of the state's case, defendant requested that the trial court deliver the witness-false-in-part jury instruction. Defendant argued that AD's story changed during her trial testimony. Specifically, defendant based his request on AD testifying on cross-examination that she had gone to the court to get the FAPA order removed and, then, on redirect, that she had not tried to remove the order; and also on her testifying on cross-examination that she did not have access to any of defendant's bank accounts, but also stating that she was able to get money out of defendant's account with his permission. Defendant argued that "both things can't be true" and that he was entitled to the instruction.

The court declined to give the instruction, ruling:

"In light of [AD's] emotional testimony, I don't think those were things that were mutual—mutually exclusive. I don't think—Witness False in Part is given when someone kind of essentially admits, 'Yes, I lied earlier when I said that.' Those were not the instances here. [AD], I think, was trying to answer questions as best she could. So, I don't—I don't—you can certainly argue those things to the jury

as evidence that she was not telling the truth. But I don't think they were—they are evident on their face that she is not telling the truth about those things. So, I will not give Witness False in Part."

On appeal, defendant argues that the trial court erred. Considering the record under the standard announced in *Payne II*, we conclude that the trial court did not err in declining to give the witness-false-in-part instruction.

The witness-false-in-part instruction is based on ORS 10.095(3), which provides that the jury is "to be instructed by the court on all proper occasions * * * [t]hat a witness false in one part of the testimony of the witness may be distrusted in others." In *Payne II*, the Supreme Court announced that

> "a 'proper occasion' to give the witness-false-in-part instruc-
> tion exists when, considering the testimony and other evi-
> dence a party has brought to the court's attention in sup-
> port of the requested instruction, the trial court concludes
> that sufficient evidence exists for the jury to decide that at
> least one witness consciously testified falsely and that the
> false testimony concerns a material issue."

366 Or at 600. In considering the requested instruction, the trial court must view the evidence in the light most favorable to the requesting party. *Id.* at 607. In that light, the evidence must "amount to more than an honest mistake, confusion, or hazy recollection." *Id.* at 608. The trial court's decision whether or not to give the instruction is a legal conclusion, and, on appeal, we apply a legal-error standard of review. *Id.* at 607 (overruling a prior case that set out an abuse of discretion standard of review). Thus, "the inquiry for us is whether the testimony and evidence, viewed in the light most favorable to defendant, is legally sufficient to support a finding that at least one witness testified falsely and, if so, whether that false testimony concerned a material issue." *State v. Kinstler*, 307 Or App 517, 521, 478 P3d 595 (2020). In conducting our inquiry, we focus on the testimony and evidence identified at trial by defendant as supporting the instruction. *Id.*

Here, the testimony and evidence identified by defendant was (1) AD's testimony on cross-examination that

she had gone to court to remove the FAPA order, and her testimony on redirect that she had not done so; and (2) AD's testimony that she did not have access to defendant's accounts, but that she had accessed his account with his permission when he was in jail and needed something.[2]

We first address the bank account evidence. The evidence on that point is contained in the following exchange on cross-examination of AD:

"Q:   Okay. Did you have any shared banking accounts with [defendant]?

"A:   No, never. Never.

"[PROSECUTOR]:   And objection, Your Honor, relevance.

"THE COURT:   I'm likely to sustain, unless you give me a reason.

"* * * * *

"(Sidebar)

"THE COURT:   All right, next question.

"Q:   (by [Defense Counsel]) Do you have access to any of [defendant's] bank accounts?

"A:   No, I don't. No.

"Q:   Have you ever deposited money into any of his bank accounts?

"A:   If he's—

"[PROSECUTOR]:   Objection, relevance.

"THE COURT:   I'll allow that question.

"A:   If he's going to jail and he needs something from out of his account, yeah, I've taken it out.

"So, I've had permission to use his account before, yes. But I don't have—we're not in a joint or any name sharing of an account, no."

_____

[2] On appeal, defendant points to other parts of AD's testimony to support giving the witness-false-in-part instruction, particularly the inconsistencies between AD's trial testimony and her out-of-court statements to the police about the incident. However, as we understand *Payne II*, the focus of the inquiry is on the evidence that defendant identified to the trial court in support of the instruction, which did not include those inconsistencies.

That evidence is not sufficient to support a reasonable inference that AD consciously lied about having had access to defendant's bank accounts. On its face, viewing the evidence in the light most favorable to defendant, the testimony does not even support an inference that AD testified inconsistently, as the question "Do you have access to any of [defendant's] bank accounts?" is a present tense question, and AD testified only that, in the past, defendant had given her permission to access his account when he needed her to.

We next address the evidence pertaining to the FAPA order. On direct examination, AD testified that she obtained the FAPA restraining order, that she had not had the restraining order dismissed, and that it is still in effect. The court also admitted the order and proof of service on defendant as exhibits. On cross-examination, after AD became very upset during questioning and after she declined to take a minute to collect herself, the following exchange occurred:

> "Q:  You've previously gone to court and asked for the restraining order to be removed, correct?
>
> "A:  I'm sorry, what?
>
> "Q:  You have previously gone to court and asked for the restraining order to be removed?
>
> "A:  Yes, I have."

Then on redirect, the following exchange occurred:

> "Q:  Okay. And you said you did apply for the restraining order to be dismissed.
>
> "A:  No, I've never applied for the restraining order to be dismissed. I didn't—I must not have heard your question correctly. I've not applied for any type of—[defendant] was—we were talking about going down there to get rid of it, but that was way—
>
> "Q:  Okay.
>
> "A:  —early in the stages of the restraining order.
>
> "Q:  Have you ever told [defendant] that you were going to try and get it dismissed?
>
> "A:  Yeah, that's what I—yeah.

"Q:   Okay. And you've never taken any action—

"A:   No.

"Q:   —on that.

"A:   No.

"Q:   Okay. And so the restraining order is still in effect.

"A:   Still in effect."

Given the full context of AD's testimony, defendant did not point to sufficient evidence to support an inference that AD consciously testified falsely rather than that the testimony was anything more than an example of AD answering without understanding the question or making a mistake in her testimony. There was no evidence that disputed her testimony that she had not sought to dismiss the FAPA order. And, the order and proof of service of the order on defendant were trial exhibits. There was no evidentiary basis for a reasonable juror to infer that AD consciously testified falsely on cross-examination, as opposed to making a mistake. As we understand *Payne II*, such a mistake is not the equivalent of consciously testifying falsely that would make the delivery of the witness-false-in-part instruction proper. Accordingly, the court did not err in refusing to give the instruction.

Affirmed.