No. 876     December 4, 2024     591

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES ARTHUR BITZ,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR31314; A180190

Kathleen M. Dailey, Judge.

Submitted September 27, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Meredith Allen, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant. Jason A. Bitz filed the supplemental brief *pro se.*

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Kate E. Morrow, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Hellman, Judge, and Mooney, Senior Judge.

MOONEY, S. J.

Reversed and remanded.

**MOONEY, S. J.**

Defendant appeals a judgment of conviction entered after a jury found him guilty of (1) unlawful use of a weapon - firearm, ORS 166.220 and ORS 161.610, and (2) felon in possession of a firearm - firearm, ORS 166.270 and ORS 161.610.[1] Those convictions arose out of an altercation that began when defendant overheard a heated verbal exchange between his duplex neighbor, R, and her fiancé, C, which escalated after the fiancé kicked a hole into R's front door, and then ended in the adjacent parking area when defendant fired a shotgun. Defendant raises three assignments of error. We reject both *pro se* supplemental assignments without discussion. In the remaining assignment, defendant contends that the trial court erred by giving the witness-false-in-part (WFIP) jury instruction because it was not supported by the evidence. Having reviewed the record, we conclude that the evidence does not support the inference that any witness consciously testified falsely, and thus, the trial court erred by giving the instruction. We also conclude that the error prejudiced defendant. Accordingly, we reverse and remand.

## I.  STANDARD OF REVIEW

We review the trial court's decision to give the WFIP instruction for legal error, viewing the evidence "in the light most favorable to the party requesting the instruction"—here, the state. *State v. Payne*, 366 Or 588, 606-07, 468 P3d 445 (2020) (overruling "that part of" *Ireland v. Mitchell*, 226 Or 286, 359 P2d 894 (1961), that applied "an abuse-of-discretion standard of review" and holding instead that whether a proper occasion exists to give the statutory WFIP instruction is a legal conclusion that is to be reviewed for legal error); *see also State v. Gocan*, 315 Or App 222, 227, 500 P3d 85 (2021), *rev den*, 369 Or 211 (2022) ("The trial court's decision whether or not to give the instruction is a legal conclusion, and, on appeal, we apply a legal-error standard of review."). We state the facts consistently with that standard.

---

[1] The jury acquitted defendant of (1) attempted murder - firearm, ORS 163.115 and ORS 161.610, and (2) attempted first-degree assault - firearm, ORS 163.185 and ORS 161.610.

## II.  FACTS

On the night in question, defendant and his fiancé, K, heard R arguing with C. Defendant, K, and several of their friends confronted C in the duplex parking lot when C began kicking R's front door. They told C to leave, and the situation escalated into a physical altercation that concluded after defendant fired a gun and C got into his car and drove away. A surveillance camera appears to have captured the moment the gun was fired.[2] The short video does not include audio. Witness testimony about the video varies in terms of what it depicts.

The state charged defendant with attempted murder with a firearm, first-degree attempted assault with a firearm, unlawful use of a weapon with a firearm, and felon in possession of a firearm with a firearm. Defendant relied on the defenses of choice of evils, self-defense, and defense of others, alleging that C had threatened to run over the group with his car before defendant fired the gun.

A.  *C's Testimony*

C testified that he does not recall what happened because he was intoxicated that night and, additionally, he suffered a head injury in an unrelated incident that resulted in memory loss. He was able to confirm that the video showed him getting into his car, but he could not confirm whether the video showed defendant holding or shooting a shotgun:

"[THE PROSECUTOR:]   I'm going to show you what's been admitted into evidence as State's Exhibit 20. I'm going to ask you to look up at the screen. You see it?

"[C:]   Yeah.

"[THE PROSECUTOR:]   Is that you?

"[C:]   Yes.

"[THE PROSECUTOR:]   Do you remember this night?

"[C:]   No.

---

[2] At the time the parties filed their briefs, the trial court had been unable to locate the surveillance footage, which was admitted into evidence as State's Exhibit 20. It was subsequently located and is now a part of the appellate record.

"[THE PROSECUTOR:]   At all or—not at all or just a little?

"[C:]   Not at all.

"[THE PROSECUTOR:]   Is that your car you're getting in?

"[C:]   Yeah.

"[THE PROSECUTOR:]   Did someone just shoot at?

"[C:]   I—

"[THE PROSECUTOR:]   Want to look at it again?

"[C:]   I didn't see nothing.

"[THE PROSECUTOR:]   Let's see. Watch it again.

"(Video plays without audio)

"[C:]   I think there's like smoke or something, but I don't know.

"[THE PROSECUTOR:]  You don't see a guy there holding a shotgun in the back?

"[C:]   I don't—I can't—it's really dark. I can't really see nothing, but I did see smoke or something. That's all."

B.   *R's Testimony*

R testified, as relevant:

"[THE PROSECUTOR:]   [R], do you know a person named [C]?

"[R:]   Yes.

"[THE PROSECUTOR:]   Who is that?

"[R:]   My fiancé.

"[PROSECUTOR:]   Okay. Is he currently your fiancé or formerly your fiancé?

"[R:]   Currently my fiancé.

"[PROSECUTOR:]   Were you in a relationship with him in May of 2018?

"[R:]   Yes.

"* * * * *

"[PROSECUTOR:]   Okay. So, what happened? If you could take the jurors through it, what happened leading up to him getting shot at, and what did you see? If it's helpful for me to ask an easier—break it down, I can do that, too.

"[R:]   [C] came to my house. He came back. He was upset so he left for a little while and he came back and we were arguing just about where he went. And then the neighbors came over and they were trying to tell him to leave and then things just escalated and he got shot at.

"[PROSECUTOR:]   Okay. Did he kick your door?

"[R:]   He did.

"* * * * *

"[PROSECUTOR:]   All right. But once the neighbors got involved, what did that look like? * * *

"[R:] * * * They were just standing around my car and kind of like—I felt like they were kind of circling around us. Like, to where I was in a corner.

"* * * * *

"[PROSECUTOR:]   And is this a video that you've seen earlier?

"[R:]   Yes.

"[PROSECUTOR:]   And when you saw this video, did you recognize that as a fair and accurate representation of what went on that night?

"[R:]   Yes.

"* * * * *

"[PROSECUTOR:]   I'm showing you Exhibit 20 now. Is that [C] walking back from [defendant's] apartment and someone pointing at him?

"[R:]   Yes.

"[PROSECUTOR:]   What just happened?

"[R:]   His car was shot at.

"* * * * *

"[PROSECUTOR:]   Explain and describe for the jury what you saw with detail, please.

"[R:]   I saw the—there was like two other guys I think, or there was a group of people outside and they were getting in an altercation and I remember [C] had got in an altercation with [defendant] last and [defendant] had ran into his house and I thought it was over. I thought it was done, and then he came outside with a gun.

"*****

"[DEFENSE COUNSEL:]   Okay. So, the two of you were on the front porch and that's, I think, when you said the neighbors came over and began getting involved; is that right?

"[R:]   Yeah.

"[DEFENSE COUNSEL:]   When the neighbors confronted you and [C], did you stay kind of on your porch throughout those proceedings?

"[R:]   Yes.

"*****

"[DEFENSE COUNSEL:]   Okay. It turned physical because [C] attacked one of those neighbors; is that correct?

"[R:]   No.

"[DEFENSE COUNSEL:]   He didn't attack one of the neighbors?

"[R:   No.

"[DEFENSE COUNSEL:]   Never punched him.

"[R:]   They got in a fight.

"[DEFENSE COUNSEL:]   They got in a fight? Okay. Who initiated the physical contact of that fight?

"[R:]   Well, they both fought.

"*****

"[DEFENSE COUNSEL:]   Okay. So, it was a mutual combat?

"[R:]   Yes."

C.   *K's Testimony*

K testified, as relevant:

"[DEFENSE COUNSEL:]   Okay. When did you first become aware that there was some sort of altercation or something out of the ordinary was happening?

"[K:]   When I could hear [R] yelling for help.

"* * * * *

"[DEFENSE COUNSEL:]   Okay. What was she saying?

"[K:]   She was saying, help, call the police, he's kicking in my door.

"* * * * *

"[DEFENSE COUNSEL:] = Okay. Is your memory perfect as to what exactly occurred on that occasion?

"[K:]   No.

"* * * * *

"[K:]   I recall a lot of it, yes.

"[DEFENSE COUNSEL:]   So, what happened after you came outside and you go and respond to [R]'s calls for help?

"[K:]   [A neighbor] and I got closer. [The neighbor] was telling [C] that he should probably just leave.

"* * * * *

"[DEFENSE COUNSEL:]   And what happened when [C] went to your door?

"[K:]   He started hitting [defendant].

"* * * * *

"[DEFENSE COUNSEL:]   Okay. Had [defendant] said anything to [C] at that point?

"[K:]   No.

"* * * * *

"[DEFENSE COUNSEL:]   Okay. So, he walked from the area in front of the entryway of your residence to his car; is that correct?

"[K:]   Yes.

"[DEFENSE COUNSEL:]   Did you follow him?

"[K:]   Yes, I did.

"[DEFENSE COUNSEL:]   Were you pointing at him as you followed him?

"[K:]   Yes, I was.

"[DEFENSE COUNSEL:]   Now you've watched videos that are surveillance footage of this incident that were captured; is that correct?

"[K:]   Yes.

"[DEFENSE COUNSEL:]   And in that—one of those videos, you see a woman pointing a finger at [C] as he's walking away somewhat following after him; is that correct?

"[K:]   Yes.

"[DEFENSE COUNSEL:]   Is that you?

"[K:]   Yes, it is.

"[DEFENSE COUNSEL:]   Did [C] threaten anybody with anything?

"[K:]   Yes. He threatened to run us all over with his car.

"*****

"[DEFENSE COUNSEL:]   You heard a shot shortly thereafter that; is that correct?

"[K:]   Yes."

The state played the video to K during its cross-examination of her. K testified that the video showed her following C through the parking lot, while pointing her finger at him, and then recoiling when the shot was fired:

"[THE PROSECUTOR:]   Okay. So, you're still pointing. This guy is getting in his car. You're still pointing at him. Okay. You're still standing there watching him. There's a gunshot. Now you didn't know that [] defendant was going to shoot that gun, did you? You can see him right there.

"[K:]   No, I didn't know.

"[THE PROSECUTOR:]   You see him right there, right?

"[K:]   Yes.

"[THE PROSECUTOR:]    Okay. And that's him holding the shotgun, isn't it?

"[K:]   Holding something, yes.

"[THE PROSECUTOR:] Well, holding something. Let's talk about that. Did you just flinch in this video?

"[K:]   I did.

"[THE PROSECUTOR:]    Did you hear a loud boom?

"[K:]   Yes, I did.

"[THE PROSECUTOR:]    Did you turn around and look and see a shotgun? It looks like you turned around?

"[K:]   I'm not facing [] defendant.

"*****

"[THE PROSECUTOR:]  You started taking a step towards [] defendant, didn't you?

"[K:]   Yes.

"[THE PROSECUTOR:]    And are you still going to tell this jury you didn't see [defendant] holding that shotgun that just got shot past your head?

"[K:]   Under the circumstances and the stress, no, I did not.

"[THE PROSECUTOR:]   What does that mean? You don't remember or just didn't see it?

"[K:]   As far as I know, I didn't see it.

"[THE PROSECUTOR:]   What does that mean, 'as far as I know'?

"[K:]   I don't know. I didn't see it."

D.  *Defendant's Theory and the State's Argument*

Defendant claimed that he acted to defend himself and others by firing a warning shot at C's car after C threatened to run people over while he was walking to his vehicle. K's testimony and her credibility were thus especially important to his case, a fact that the prosecutor highlighted in the state's rebuttal argument during closing:

"[K] testified. The judge has instructed you when you look at someone's testimony, do you believe them? Should you discount some of their testimony? Should you say, I should be very careful with this?

"When you have a witness who is the fiancé of the person on trial *** and when she sees [the video] put up, I'm not sure if that's a shotgun; I mean, I'm not sure that I see him holding that; I'm not sure that's a shotgun blast that just went by my head. I was scared. It was a long time ago. That's a lie. She loves the defendant. She wants to protect him. That makes sense that she would lie for him, but you should discount her testimony.

"And that leaves us with who comes up with the idea that [C] is going to get in that car and mow everybody down? *** [D]efendant makes that statement to the detectives early on, and then suddenly [K] is here saying it today. No report of her saying it earlier and it comes up—when it comes to the investigation, say what's going on, no, that's now, three years later. That's when that's coming out.

"This—the person who remembers that clearly, but doesn't remember the shotgun going off just a couple feet behind her head and blowing a hole into that car. Doesn't remember turning around, seeing [] defendant clearly holding that shotgun. That's what normal—normal people do that. You hear a shotgun, you turn around, see where it came from, your loved one is holding it. You remember that."

The trial court gave the WFIP instruction over defendant's objection.

## III.   ANALYSIS

The WFIP instruction provides:

"Sometimes a witness may give incorrect or even inconsistent testimony. This does not necessarily constitute lying on the part of the witness. The witness's testimony may be an honest mistake or confusion. The witness may simply forget matters, or his or her memory of an event may contain honest inconsistencies or contradictions. Also, different witnesses may observe or recount the same event differently.

"However, if you find that a witness has intentionally lied in part of his or her testimony, you may, but are

not required to, distrust other portions of that witness's testimony.

"As jurors, you have the sole responsibility to determine which testimony or portions of testimony you will or will not rely on in reaching your verdict."

UCrJI 1029.

ORS 10.095 requires a trial court to give the WFIP instruction on all proper occasions:

"[A] 'proper occasion' to give the statutory [WFIP] instruction exists when, considering the testimony and other evidence viewed in the light most favorable to the party requesting the instruction, the trial court concludes that sufficient evidence exists for the jury to decide that at least one witness consciously testified falsely and that the false testimony concerns a material issue."

*Payne*, 366 Or at 607. "[T]he [WFIP] instruction is not disfavored in Oregon. The mandate of ORS 10.095 is that the instruction be given on 'all proper occasions.'" *Id.* at 600 n 3.

To be clear, the WFIP instruction "is not intended to assist the jury in determining whether a witness has testified falsely in the first instance." *State v. Labossiere*, 307 Or App 560, 569, 477 P3d 1 (2020). It is instead an instruction that assists a jury to evaluate a witness's testimony when there is sufficient evidence for the jury to conclude first that the witness consciously gave false testimony. In other words, when the evidence would support that a witness lied under oath, ORS 10.095 requires the court to instruct the jury that it may, but is not required, to distrust other testimony given by that witness. "Evidence of a witness's false testimony must amount to more than an honest mistake, confusion, or hazy recollection." *State v. Daly*, 308 Or App 74, 79, 479 P3d 335 (2020) (internal quotation marks omitted). The fact that two witnesses testify differently about the same event is not enough, without more, to support the inference that one of them lied under oath. The differences in their testimony may simply be due to the amount of precision each uses to describe the event, or it may be due to "differences in [their] perspective[s]." *State v. Hall*, 324 Or App 802, 811-12, 526 P3d 815, *rev den*, 371 Or 476 (2023). As we have said, "[w]hen two witnesses describe an event, there will nearly always be

inconsistencies in their accounts[,]" which "are not usually, in and of themselves, indicative of conscious falsity." *State v. Walker*, 291 Or App 188, 194, 419 P3d 794 (2018).

By contrast, evidence may be sufficient to support the inference that a witness lied under oath when that witness, being sworn to tell the truth, unequivocally denies that he or she made a prior statement, or when two witnesses offer entirely incompatible testimony. *See Payne*, 366 Or at 608 (concluding that the evidence was sufficient for a jury to determine that the complaining witness had testified falsely after she repeatedly and unequivocally denied, in sworn testimony, that she had referred to the defendant's race in her prior statements to the police, when the police officer to whom she spoke testified that the witness had, in fact, referred to the defendant's race in her statements to him); *see also Daly*, 308 Or App at 80-81 (concluding that the evidence was sufficient for a jury to determine that one of the witnesses had testified falsely where two witnesses gave contradictory testimony about whether one witness had threatened the other witness with physical harm if she testified).

Here, we conclude that, even viewing the evidence in the light most favorable to the state, the evidence does not support the inference that any witness consciously gave false testimony. C testified that he could not recall the incident, and he gave intoxication and a subsequent head injury as the reasons for his lack of memory. There is no evidence that C lied under oath about his inability to recall the events in question, or even that he had a reason to do so. The record likewise does not support the state's view that the respective testimonial accounts of the key events given by R and K were so incompatible on the question of who initiated the physical altercation between defendant and C that the jury could reasonably infer that one of them must have given false testimony on that point. The discrepancies between K's testimony and R's testimony certainly suggest that they have different perspectives about what happened that night. That they experienced the events from different vantage points is clear from the video itself—K is walking closely behind C while R remains near her car and the front

porch. Their respective accounts of what they saw and heard as the event unfolded makes sense given their different perspectives. But one cannot make the leap from that to the intentional giving of false testimony on a key issue without the aid and assistance of speculation.

And finally, K's testimony that she did not see the gun even after hearing a shot, and then immediately turning and walking toward defendant, does not support an inference that she lied under oath about whether she witnessed defendant in possession of a firearm. At most, the evidence suggests that the altercation was chaotic and confusing. And even if we could imagine that a video clearly depicting defendant holding and firing a gun with K turning toward him just at or after that moment might suggest that K's testimony that she did not see defendant with a gun was not truthful, that is not the state of the record before us. The surveillance footage is dark and of low technical quality. Neither C nor R contradicted K's testimony, and no prior statements were offered to contradict K's testimony that, in light of the chaos in the parking lot, she did not see the shotgun. Given that lack of evidentiary support, it was legal error for the trial court to give the WFIP instruction.

We must now assess the likelihood that the instruction, given in error, "affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). If it did, then we must reverse the resulting convictions. If it did not, then we are obliged to affirm those convictions. Or Const, Art VII (Amended), § 3.[3] As we assess the likelihood that the giving of the WFIP instruction to the jurors affected their verdict, we are to "consider[] the instructions as a whole and in the context

---

[3] Article VII (Amended), Section 3, of the Oregon Constitution provides, as relevant:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, *such judgment shall be affirmed, notwithstanding any error committed during the trial*; or if, in any respect, the judgment appealed from should be changed, and the supreme court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court. ***"

(Emphasis added.)

of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Payne*, 366 Or at 609 (internal quotation marks omitted).

We first reject the state's contention that because the WFIP instruction was material only to the charges on which defendant was acquitted, attempted murder and first-degree assault, any error in giving that instruction was harmless. In the state's view, because defendant admitted to shooting the firearm and stipulated to having a prior felony conviction, the elements of the two crimes of which he was convicted "were not disputed by the testimony" of any witness and, therefore, defendant was not prejudiced by the instruction. However, the state's view is based on an incorrect statement of the law, and we reject it. Self-defense applies to both crimes of conviction. *State v. Mickels*, 330 Or App 633, 637-38, 544 P3d 446 (2024) (holding that "all crimes are subject to justification defenses unless an exception applies," and that the firearm enhancement in ORS 161.610(2) "is an element of a new, aggravated crime" of felon in possession of a firearm with a firearm, and the state must disprove a justification defense raised by a defendant); *State v. Strickland*, 303 Or App 240, 242, 244-45, 463 P3d 537, *rev den*, 366 Or 827 (2020), *cert den*, ___ US ___, 141 S Ct 1517 (2021) (reviewing the relevancy of evidence to the defendant's claim of self-defense, raised as a justification defense against multiple charges, including unlawful use of a weapon).

Moving to whether it is likely that the WFIP instruction, given in error, affected the verdict, we conclude that it was. We note that unlike many cases involving the WFIP instruction, it was the state, not defendant, who requested the instruction here, with defendant assigning error to the giving of the instruction, not to the refusal to give it. Thus, we are not faced with a situation where the jury was deprived of an instruction that the evidence actually supported and that might assist the jury in evaluating it. We are instead faced with a situation where the jury was given an otherwise proper instruction that did not apply to the case before it. The risk of giving such an instruction is that simply by

giving it, the jury may speculate about why it was given, resulting in "mischief in the jury room[,]" especially when it is "given abstractly[ ]"—meaning without support in the record. *Payne*, 366 Or at 600 n 3 (internal quotation marks omitted). We acknowledge that we have rejected the argument that the WFIP instruction is an inherently improper comment on the evidence. *See State v. Zelinka*, 130 Or App 464, 477 n 14, 882 P2d 624 (1994), *rev den*, 320 Or 508 (1995) (rejecting argument that prior version of the WFIP instruction, which provided that a witness who lies in part "is likely to lie in other parts" of their testimony, was an improper comment on the evidence). But on this record, we cannot say that there is little likelihood the error affected the verdict, particularly in light of the fact that the prosecutor affirmatively drew the jury's attention to that instruction in his closing argument and he urged the jury to "discount [K's] testimony" on the basis of that instruction.

The absence of evidence supporting that any witness consciously gave false testimony rendered the WFIP instruction useless to the jurors. The prosecutor's express reliance on the instruction likely impacted the jury's deliberations and verdict. Under those circumstances, the Oregon Constitution obligates us to reverse defendant's convictions and remand for further proceedings.

Reversed and remanded.